UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANDRE JENKINS,

                            Petitioner,

            -against-

MICHAEL CAPRA,

                            Respondent.
-----------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM AND ORDER**
15-CV-2936 (JMA)

**APPEARANCES:**

Richard E. Mischel
Mischel, Neuman & Horn, P.C.
1 Whitehall Street, 10th Floor
New York, NY 10004
        *For Petitioner*

Marion M. Tang
Suffolk County District Attorney's Office
200 Center Drive
Riverhead, NY 11901
        *For Respondent*

**AZRACK, United States District Judge:**

With the assistance of counsel, Andre Jenkins petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254. After a jury trial in state court, Jenkins was convicted of three counts of first-degree robbery. He is presently incarcerated and serving an indeterminate term of twenty-two-and-a-half years to life imprisonment.

In the pending petition, Jenkins asserts two grounds for habeas relief: (1) ineffective assistance of trial counsel based on counsel's failure to advise him of his maximum sentencing exposure during plea bargaining, and (2) ineffective assistance of trial counsel based on counsel's alleged error made during summation. For the following reasons, Jenkins's petition is DENIED in its entirety.

1

# I. BACKGROUND

On April 21, 2005, a jury convicted Jenkins of three counts of robbery in the first degree arising out of the armed robberies of Kelly Walsh, Jennifer Walsh, and Dollsie Kaatsiz.

## A. **Pretrial Proceedings**

Before trial, defense counsel Michael Meenan, Assistant District Attorneys Kyle Wood and Robert Barry, and the trial court engaged in plea discussions.  (See 6/9/04 Tr., ECF No. 12; 3/21/05 Tr., ECF No. 12; 5/8/14 H., ECF No. 12-6; 6/6/14 H., ECF Nos. 12-6, 12-7.)  The parties discussed pleas with sentences of various lengths, including three-and-a-half years, four years, and twelve years.  The details of these discussions, which were revealed during an evidentiary hearing held on Jenkins's New York Criminal Procedure Law ("CPL") § 440.10 motion, are discussed in greater detail below.  See infra I.C.3.

## B. **The Trial and Conviction**

The parties proceeded to trial on April 7, 2005.  Jenkins and co-defendant, Latisha Shorts, were tried jointly.

### 1. The Prosecution's Case

The prosecution's case established the following.  In the early evening of December 21, 2003, Kelly Walsh, Jennifer Walsh, and Dollsie Kaatsiz drove to pick up Latisha Shorts to go Christmas shopping.  (Trial Tr. 89–91, 97–99, 197–201, 225–27, 349–50, 364–68, ECF No. 11.) The three women picked up Shorts outside of her mother's house at a trailer park in Amityville, New York.  (Id. at 89–91, 97–99, 197–201, 225–27, 349–50, 364–68.)  After arriving at the trailer park, Kelly Walsh, who was driving, stopped the car in a parking lot under a street light.  (Id. at 97–98, 201, 226, 367–68.)

Shorts entered the rear passenger side of the car and informed the women she was expecting a telephone call. (Id. at 99, 201, 226.) Once in the car, Shorts said, "Could you give me a minute? You are blocking traffic. Can you pull over to the right somewhere in a parking spot? Three white girls in the hood doesn't look good." (Id. at 99, 111, 201–03, 226–30, 276, 352–54, 368, 396–97.) Although the women had not observed any traffic in the trailer park, Kelly Walsh moved the car to the end of the row of parking spots at Shorts's direction. (Id. at 98–101, 186, 198, 201–03, 276, 302–03, 352–54, 368–69.) The new parking spot was more secluded and had less lighting. (Id. at 99–101, 111–12, 203, 228, 276–78, 355, 368–69, 397.) Shorts informed the other women that they should wait there for a friend of hers who also wanted to go shopping. (Id. at 226–29.) While waiting, Shorts made a telephone call and was overheard saying, "I'm with the three girls now," and "we [are] here . . . we want[] to go . . . hurry up." (Id. at 228–30, 354.)

Kelly and Jennifer Walsh then noticed a man, who they later identified as Andre Jenkins, emerge from an alleyway that led to the parking lot. (Id. at 112–14, 230, 298, 369.) Jenkins approached the car, pointed a gun at Kelly Walsh, pushed the gun into her left cheek, and told her to turn off the car. (Id. at 114–15, 169–70, 231–32.) He also demanded her cell phone, and all the jewelry, pocketbooks, and other possessions the women had in the car. (Id. at 115–16, 232, 279–80.) At one point, Jenkins reached into the car and lowered the rear left window. (Id. at 116.) All four of the women handed over their property. (Id. at 115–17, 232, 279–80, 299, 356–60, 369–74.) Jenkins then demanded that Kelly Walsh give him the car keys. (Id. at 116.)

After threatening Kelly Walsh by cocking the gun, pointing it at her chest, and telling her "I have your license and know where you live," Jenkins tossed the car keys away, picked up the women's possessions, and exited down the alleyway. (Id. at 117, 235, 358–59.) The women exited the car, found the keys, and drove away. (Id. at 117–18, 132–34, 235–37, 360–61, 392.)

As the women drove past a nearby deli, Dollsie Kaatsiz recognized Jenkins standing outside of the deli. (Id. at 237.) Kelly Walsh parked the car at a Checkers restaurant across the street. (Id. at 120, 237–38.) Shorts went inside the Checkers, borrowed someone's cell phone, and called the police. (Id. at 120, 238, 302, 361, 383–85.) The police arrived and escorted the women to the deli to see if they could recognize anyone as the gunman. (Id. at 120–21, 239, 362–63.) They were unable to do so. (Id. at 120–21, 239, 363.) The police then transported the women to the police station where they were interviewed in separate interview rooms. (Id. at 540–42, 548–50.)

During her interview, Shorts informed Detective Philip Frendo that she had spoken with two people on the phone since the other women arrived to take her to the mall—a female friend and her boyfriend, Andre Jenkins. (Id. at 548.) Detective Frendo subpoenaed Shorts's cell phone records, which revealed that Shorts had called Jenkins twice three hours before the robbery, and again right before the robbery. (Id. at 551, 629–34.) After further investigation that linked Jenkins to Shorts, police arrested both of them on January 14, 2004. (See, e.g., id. at 553–60, 702–09, 630–34.)

Kelly Walsh, Jennifer Walsh, and Dollsie Kaatsiz each identified Jenkins in court as the person who had robbed them on December 21, 2003. (Id. at 113–14, 230, 356.)

### 2. The Defense's Case

Defense counsel called a single witness, one of Jenkins's clients in his job as a personal trainer, to support the defendant's theory that the victims had misidentified Jenkins. This witness testified that she had seen Jenkins with metallic bridgework in his mouth and a broken finger before the date of the robbery. (Id. at 834–45.) Jenkins's co-defendant, Shorts, rested without calling any witnesses.

4

### 3. Summations

In summation, Meenan argued that the victims had misidentified Jenkins, emphasizing several unique characteristics that had been missing from the witnesses' descriptions of the perpetrator immediately following the robbery. (Id. at 907–34.)  In particular, Meenan noted Jenkins's height, lack of freckles, neck scar, broken finger, and metallic bridgework—all of which had been omitted from the witnesses' initial descriptions. (Id.) "The only reasonable explanation," Meenan submitted to the jury, "is the fact that the perpetrator and my client are not one and the same." (Id. at 925.)

Meenan did not argue a formal alibi. He did, however, note that the phone records in evidence placed Jenkins in Orange, New Jersey before the robbery. (Id. at 933.)  Additionally, Meenan argued that Jenkins had no motive to commit the robbery, suggesting that doing so would not have been worth the risk. Meenan asked the jury: "Do you think that [Jenkins] is going to drop the phone at his mother's house and race out in the face of rush hour traffic, in a holiday season, to then, take a gun and stick it in people's faces and run away with property that doesn't belong to him, when he has all that to live for?" (Id. at 926 (emphasis added).)

The prosecution seized on Meenan's slip of the tongue in rebuttal:

> Now, there has been some reference to this phone call, which occurs up here. Okay?  At approximately 1700 hours. It's about five o'clock. But I remind you, this incident occurs at 8 o'clock. Three hours later.  About three hours after that. And there has been some reference, that this is rush hour. Okay, in fact, December 21st, 2003, is a Sunday night. The defendant could easily make it from Orange, New Jersey, or to the location in Amityville, I'll bet you, in an hour.

(Id. at 951–52 (emphasis added).)

### 4.  Conviction

On April 21, 2005, the jury convicted Jenkins on all three first-degree robbery counts.  (Id. at 1124–28.)  Shorts was acquitted on the three robbery counts, but convicted on a conspiracy count.  (Id. at 1124–28.)

## C.  Post-Conviction Proceedings

### 1. Sentencing

On June 30, 2005, ADA Barry wrote defense counsel a letter expressing his intention to establish that Jenkins was eligible for sentencing as a persistent violent felony offender.  (5/8/14 H. 9–10.)  A hearing on the matter was held on October 3, 2005.  Later that day, Judge Andrew Crecca sentenced Jenkins as a persistent violent felony offender to three concurrent terms of twenty-two-and–a-half years to life imprisonment.  (Id.)

### 2.  The Direct Appeal

With the aid of appellate counsel, Richard Mischel and Steven Brounstein, Jenkins appealed his conviction to the Second Department of the New York Appellate Division.[1]  On appeal, Jenkins raised several arguments, only one of which is relevant to the instant Petition.  In particular, Jenkins argued that he was deprived of effective assistance of trial counsel by Meenan's "single error" in summation where Meenan incorrectly referred to rush hour traffic on a Sunday.  (Br. for Def.-Appellant at 42–57, ECF No. 10-5.)

The Second Department affirmed the judgment of conviction in all respects.  People v. Jenkins, 93 A.D.3d 861 (N.Y. App. Div. 2d Dep't 2010).  The Second Department summarily concluded, "[t]he defendant's contention that he did not receive the effective assistance of counsel is without merit."  Id. at 862.  Although Jenkins requested leave to appeal, the New York Court of

---

[1] Mischel also represents Jenkins on the pending Petition.

Appeals denied that request on June 28, 2012. <u>People v. Jenkins</u>, 19 N.Y.3d 962. Jenkins did not file a petition for a writ of certiorari with the United States Supreme Court.

### 3. The Motion to Vacate

#### i. The Motion and Hearing

On September 24, 2013, Jenkins, with the aid of counsel, filed a CPL § 440.10 motion to vacate his judgment of conviction on the grounds that he had been denied effective assistance of trial counsel during the plea bargaining process based on Meenan's failure to correctly advise him of his sentencing exposure. Jenkins claimed that he was repeatedly informed that he faced a minimum sentence of ten years imprisonment and a maximum sentence of twenty-five years imprisonment. In actuality, due to his status as a persistent violent felony offender, if convicted after trial, Jenkins faced a mandatory indeterminate sentence with a minimum period of imprisonment of at least twenty years, not to exceed twenty-five years, and a maximum of life imprisonment.[2] Jenkins argued that had he known he faced a mandatory minimum indeterminate sentence of twenty years to life, he would have accepted the People's plea offer of four years, or in the alternative, the People's plea offer of twelve years.

On January 2, 2014, Judge William Condon, to whom the matter was assigned for disposition, granted Jenkins's request for an evidentiary hearing on the motion. The hearing was held on May 8, 2014 and June 6, 2014. ADAs Robert Barry, Lucie Kwon, and Kyle Wood testified at the hearing, as did Meenan and Jenkins. Also at the hearing, several exhibits, including

---

[2] Jenkins was indicted on three class B felonies—i.e., three counts of first-degree robbery. <u>See</u> New York Penal Law ("PL") § 160.15[4] (codifying first-degree robbery as a class B felony). Pursuant to the persistent violent felony offender statute, CPL § 70.08(3)(a–1), a persistent violent felony offender who is convicted of a class B felony faces a mandatory indeterminate sentence with a minimum period of imprisonment of at least twenty years, not to exceed twenty-five years, and a maximum of life imprisonment.

transcripts of court proceedings during which potential pleas were discussed, were admitted into the record. The evidence before the § 440.10 court showed the following.

Jenkins was arraigned on February 11, 2004 in Suffolk County Court before Judge Louis Ohlig. ADA Wood, ADA Kwon, and Meenan were all present at the arraignment. During the proceeding, Meenan, Jenkins's trial counsel, made a bail application to reduce Jenkins's bail. (2/11/05 Tr. 7–14, ECF No. 12.) To assess the application, the court inquired into Jenkins's sentencing exposure. (Id. at 9–12.) ADA Wood, who was assigned to Jenkins's case, stated that Jenkins was a prior felony offender and that he was facing "substantial jail time." (Id. at 9.) Judge Ohlig probed further, asking: "What's he face 25 years on this?", to which ADA Wood responded, "Judge, he faces upwards of 25 years, yes." (Id. at 12.) Then ADA Kwon, another ADA who appeared on the record, but was not assigned to Jenkins's case, clarified: "25 years to life, Judge." (Id. at 12.) At the § 440.10 hearing, ADA Kwon testified that this clarification was based on her understanding that Jenkins was a persistent violent felony offender. (5/8/14 H. 34–35.)

On June 9, 2004, Jenkins again appeared before Judge Ohlig. During the proceeding, Judge Ohlig referenced a twelve-year plea offer. (6/9/04 Tr. 2–3.) After stating that Jenkins faced the "possibility" of twenty-five years imprisonment, Judge Ohlig indicated that he would not accept a plea of twelve years. (Id. ("I'm not on board with the People's offer of 12 years. So I want to make that crystal clear to your client.").) At the § 440.10 hearing, ADA Wood recalled plea discussions with Meenan from around that time in the range of ten to twelve years. (5/8/14 H. 57–59.) Specifically, he recalled Meenan indicating that Jenkins would not accept an offer in that range. (Id.) ADA Wood testified,

8

> The best that I can recall is that even with the offer, the posture of the case never went beyond sort of any serious—into any serious plea negotiations beyond the offer. And again, I know that—my recollection is that [Meenan] was told no, [Jenkins is] not going to take that.

(Id. at 58.)

On March 17, 2005, Judge Andrew Crecca, who had been assigned the case after Judge Ohlig retired from the bench at the end of 2004, held an off-the-record discussion in chambers regarding a potential plea. Meenan was present for this discussion along with ADA Barry, who had replaced ADA Wood on the case. ADA Barry recalled this discussion at the § 440.10 hearing. According to ADA Barry, the three men discussed a possible plea of three-and-a-half years, which Judge Crecca was willing to honor.[3] (Id. at 5–6.) ADA Barry recalled that Meenan had indicated that the defense was "not going to accept that offer" and was ready for jury selection. (Id. at 6.)

At the § 440.10 hearing, ADA Barry recalled an additional off-the-record discussion that occurred on March 21, 2005, in which he, Meenan, and Judge Crecca discussed a possible plea of four years, which the court was again willing to honor. (Id. at 6–8, 16–17; see also 3/21/05 Tr. 5–9.) This offer would only be available for that day. (5/8/14 H. 7–8.) The court then held a status conference with Jenkins in open court and discussed the four-year plea offer with him. (3/21/05 Tr.) The court informed Jenkins that he faced a maximum twenty-five-year sentence and a minimum ten-year sentence. (Id. at 5–6.) Jenkins indicated that he wanted to talk to his family before accepting any plea. (Id. at 8.) After further questioning by the court, Jenkins confirmed that he was willing to let the one-day offer expire. (Id. at 8–9.) Jenkins explained: "Sir, there is a

---

[3] The Court notes that between the June 9, 2004 plea offer for twelve years and the March 21, 2005 offer for three-and-a-half years the following events took place: On October 13, 2004 ADA Wood and Shorts, Jenkins's co-defendant, entered into a stipulation to withdraw her guilty plea. This meant that Shorts was no longer a prosecution witness poised to testify against Jenkins. Rather, Shorts decided to proceed to trial with Jenkins. Additionally, on October 4, 2004, Judge Ohlig held a Huntley hearing with regard to statements made by Jenkins to the police. As a result of the hearing, the statements were suppressed. However, Jenkins's acknowledgment of his cell-phone number was held to be admissible.

factor of fear that lingers on me because I know the maximum exposure. But I would ask you, if you were not guilty of a crime, how far would you be willing to go to prove your innocence? Yes, three and a half years is substantially less than twenty five years. But at the same time my life is still taken."[4] (Id. at 7.)

At the § 440.10 hearing, Meenan testified that he had discussed the four-year plea offer with Jenkins.[5] (6/6/14 H. 17–19.) Meenan also testified that he had explained the benefits of the plea to Jenkins. (Id. at 46.) He recalled that he advised Jenkins to take the four-year plea, despite several favorable developments in the case.[6] (Id. at 57–59; 61–62.) He described himself as "emphatic" when advising Jenkins to plead guilty. (Id. at 61–62.) Meenan even recalled discussing the plea with Jenkins's family. (Id. at 64.) At one point during his § 440.10 testimony, Jenkins contradicted Meenan on this issue. On cross-examination, Jenkins claimed that Meenan had never advised him to take a plea and in fact, had never discussed pleading guilty with him at all. (Id. at 103, 131.) On re-cross, however, Jenkins recanted and stated that Meenan had advised him to take the four-year plea, adding: "He was kind of adamant: Andre, you should take the four years." (Id. at 135.)

Jury selection began on April 7, 2005. ADA Barry testified that there were no further plea discussions. (5/8/14 H. 8–9.)

On June 30, 2005, ADA Barry wrote Meenan a letter asserting that Jenkins was eligible for sentencing as a persistent violent felony offender. (6/6/14 H. 24.) At the § 440.10 hearing,

---

[4] Although Jenkins mentioned a plea offer of three-and-a-half years, in response, the court indicated that the offer currently pending was actually for four years. (3/21/05 Tr. 7–8.)

[5] Although Meenan could not recall whether the offer on that date was for three-and-a-half or four years, (6/6/14 H. 19–20), a record of the transcript from the proceeding confirms the offer was for four years, (3/21/05 Tr. 7–8).

[6] These developments are discussed in detail at footnote 3.

Meenan testified that, upon receipt of this letter, he informed Jenkins of Jenkins's sentencing exposure. (Id. at 23–26.) Meenan testified that, prior to receiving the letter, he had never informed Jenkins that Jenkins could be sentenced as a persistent violent felony offender and could receive a life sentence. (Id.) For instance, Meenan testified that when advising Jenkins about accepting the four-year plea offer made on March 21, 2005, he relied on Judge Crecca's sentencing estimate of twenty-five years. (Id. at 15–23.)

Jenkins corroborated Meenan's testimony on this point. At the § 440.10 hearing, Jenkins testified that prior to the June 30, 2005 letter from ADA Barry, Meenan had not informed him that he was facing a maximum sentence of life imprisonment. (Id. at 80, 96–97.) Jenkins claimed he first learned about his actual sentencing exposure, when he saw the letter written by ADA Barry regarding his persistent violent felony offender status. (Id. at 96–97.) Jenkins also recalled that at his arraignment, Judge Ohlig mentioned a potential sentence of twenty-five years. (Id. at 82.) Jenkins testified that from that point to trial, he was operating under the impression that he faced a maximum twenty-five year sentence. (Id. at 82–97.)

Also, at the § 440.10 hearing, Jenkins testified that his decision to let the four-year plea offer expire was "absolutely" premised on his understanding that the maximum sentence he faced was twenty-five years. (Id. at 90.) Jenkins explained his reasoning, "I figured I could take a chance with that because ten to 25, there's 15 years in the middle of that, so I lose at trial and I don't get the minimum of ten, I'll get 12 years, I'll get 13 years, maybe get 14 years. I'm not thinking 25 years, I'm not thinking I'm going to go to jail for the rest of my life." (Id. at 90.) Jenkins also stated,

> I went to trial [in another case] and the maximum sentence was not given to me. Even though I lost at trial, in my mind, again, my criminal—for lack of a better word—savvy, I'm familiar, so if he's telling me ten to 25, as I said earlier, even if I lose trial, he will give me what, 12, 13, 14, 15. Not 25. I've been to trial, I lost

11

and I didn't get the maximum sentence.  So in my mind, the maximum sentence is not even an option.  I'm not thinking that.

(Id. at 118.)  Jenkins denied that Shorts's withdrawal of her guilty plea influenced his decision to reject the plea offer, (id. at 112), but agreed that the court's decision to suppress his statements to the police was a factor in that decision, (id. at 113–14).

When asked if he would have taken a plea had he been accurately informed of his exposure, Jenkins stated that he would not have "gambled" with his whole life.  (Id. at 91–92.)  The following colloquy from Jenkins's direct examination is illustrative:

> Q: Once again, sir, if you had possessed that information regarding your potential of spending the rest of your life in prison mandatory, would you have entered a different discussion regarding pleas?
>
> A: Absolutely.
>
> Q: Would you have taken the four years?
>
> A: Absolutely.
>
> Q: Do you have any doubt about that?
>
> A: No, sir.
>
> Q Would you have come to court and pled guilty before the Court and accepted a four-year sentence?
>
> A: To save my life; yes. I would have.[7]

(Id. at 98.)

Nonetheless, Jenkins maintained his innocence throughout the § 440.10 hearing.  On cross-examination, Jenkins was asked if he would have pled guilty, despite his belief that he was innocent:

> Q: Have you said that you would have pled guilty—you've told us just now that you would have pled guilty if you could have, correct? Did you say that?

---

[7] In fact, petitioner faced a mandatory indeterminate sentence of twenty to twenty-five years to life.

A: Yes, sir.  I would have pled guilty in order not to receive a life sentence.  I've learned over the course of my incarceration that the court system, now and since then, has been based upon guilty pleas.  There are a lot of men who plead guilty to save their lives.  It's called cutting their losses, sir.  And I would cut my losses.  I want to be with my mom, my wife and my son.  I would have pled guilty had I known I would receive a life sentence.

Q: Mr. Jenkins, are you saying you would have pled guilty when you were in fact not guilty? . . . You're saying that you would have copped to a plea of something you hadn't done in order to get the favorable sentence; is that what you're saying?

A: In order not to receive a life sentence, sir, I would have cut my losses and pled guilty so that I could be free with my family.  That's what I would have done.  I would have pled guilty so that I could be with my family and not die in prison.

Q: So are you saying that you are still maintaining your innocence of these three robberies for which you were convicted?

A: Am I maintaining my innocence today?

Q: On those three robberies.

A: What I'm saying today to you, sir, is that I'm in court now because [Meenan] never advised me that if I would have pled guilty initially to go home.  If it takes me pleading guilty now to go home, I will so I can go home.

The Court: We don't allow not guilty people to plea in this courtroom, Mr. Jenkins.

(Id. at 100–102.)  Later Jenkins stated: "I would have pled guilty to those robberies, sir, even though I did not do them.  I would have pled guilty, sir, so I would not have to receive a life sentence."  (Id. at 110.)  Jenkins also repeatedly reaffirmed that he had been confident he could win at trial.  (Id. at 103, 112, 127.)  In particular, Jenkins stated he "knew who had ultimately did the crime," suggesting that the actual perpetrator was someone other than himself.  (Id. at 112.)

ADA Wood, ADA Barry, and Meenan were also all questioned about whether Jenkins would have accepted a plea offer had he been accurately informed of his sentencing exposure.

ADA Wood testified that the "overriding theme" of the case had been that Jenkins was "headed towards trial" and not interested in a plea. (5/8/14 H. 62–63.) He agreed on direct examination that, during his involvement in the case, he never got the impression that Jenkins was interested in a plea of any kind. (Id. at 63.) ADA Wood noted that this was the case even after Jenkins had received favorable rulings in pretrial proceedings. (Id. at 63–64.) ADA Barry also testified that during his involvement with the case, he "never got the impression" that Jenkins was interested in a plea of any kind. (Id. at 10–11.) Meenan testified that Jenkins had never told him that Jenkins "wished he had pled guilty." (6/6/14 H. 68.) Meenan did, however, speculate that he thought the conversation "would have been different" had Jenkins known his actual exposure. (Id. at 69–70.)

### ii. The State Court's Decision

Judge Condon issued his decision on September 12, 2014. (§ 440.10 Decision, ECF No. 9-7.) Based on the record before the Court and the testimony adduced at the evidentiary hearing, Judge Condon denied Jenkins's motion to vacate the judgment of conviction.

The court evaluated Jenkins's ineffective assistance of counsel claim under both the federal and state standards, making explicit findings regarding both deficiency and prejudice. Regarding the deficiency prong of Jenkins's ineffective assistance claim, Judge Condon determined that Meenan had represented Jenkins "effectively" and that Meenan's representation "was within the standard of reasonableness judged by prevailing norms." Id. The court noted that several New York courts have held that a defense attorney's failure to advise his client of the implications of being a persistent violent felony offender did not amount to "less than meaningful representation." Id.

Regarding the prejudice prong, Judge Condon determined that Jenkins had failed to establish prejudice. Id. First, the court stated that it was "not persuaded that the defendant would

14

have accepted any plea bargain, irrespective of the offered sentence," given Jenkins's statement at

the March 21, 2005 conference regarding his "life" being "taken." (Id.)  Additionally, "[t]he court

[was] . . . not persuaded that the defendant would have accepted a plea bargain, even if he had been

told by his trial attorney of the life sentence enhancement he was facing . . ." in light of the fact

that Jenkins "never demonstrated any willingness or inclination to give up his right to trial or

accept any plea offer made by the People . . . ." Id.  Because Jenkins had "consistently, vigorously,

and adamantly maintained his innocence," was "'absolutely' confident that he would be found not

guilty at trial," and had been initially informed of his exposure to a maximum life sentence by

ADA Kwon at his arraignment, the court was not persuaded Jenkins would have accepted any plea

had he been reminded of his sentencing exposure during plea negotiations.  Id.

Jenkins's petition for leave to appeal Judge Condon's decision to the Second Department

was denied on May 18, 2015.  (ECF No. 12-4.)

### 3. The Instant Petition

With the aid of counsel, Jenkins filed a petition for habeas relief on May 19, 2015.  (ECF

No. 1.)  He asserts the following two grounds for relief: (1) ineffective assistance of trial counsel

based on counsel's failure to advise him of his maximum sentencing exposure, and (2) ineffective

assistance of trial counsel based on counsel's mistaken summation reference to rush hour traffic.

## II.  DISCUSSION

### A. Standard of Review

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L.

No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas

corpus to state prisoners."  Williams v. Taylor, 529 U.S. 362, 399 (2000) (O'Connor, J.,

concurring).  Under AEDPA, a district court will "entertain an application for a writ of habeas

corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

If a state court reached the merits of a federal claim, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has construed AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A decision involves "an unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. This standard does not require that all reasonable jurists agree that the state court was wrong. Id. at 409–10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

AEDPA "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Jones v. Murphy, 694

F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 565 U.S. 65, 66 (2011) (per curiam)).  This standard is "difficult to meet."  White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Metrish v. Lancaster, 133 S. Ct. 1781, 1786 (2013)), reh'g denied, 134 S. Ct. 2835 (2014).  A petition must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington v. Richter, 562 U.S. 86, 101, 103 (2011).

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006).   A state court's findings of fact will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding."  Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)).  Thus, a federal court may overrule a state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated."  Williams, 529 U.S. at 389.

## B.  Claims for Relief

Jenkins argues that he received ineffective assistance of counsel when his trial counsel failed to inform him of his sentencing exposure.  Jenkins was repeatedly informed that he faced a minimum sentence of ten years and a maximum sentence of twenty-five years.  In actuality, due to his status as a persistent violent felony offender, he faced a mandatory indeterminate sentence with a minimum period of twenty years, not to exceed twenty-five years, and a maximum of life imprisonment if convicted after trial.  Jenkins claims that had he known he faced a mandatory indeterminate sentence of twenty years to life, he would have accepted the People's plea offer of four years, or in the alternative, the People's plea offer of twelve years.

17

Additionally, Jenkins argues that he received ineffective assistance of counsel when, during summation, his trial counsel referenced rush hour traffic on the day the crime was committed. In actuality, the crime occurred on a Sunday, eliminating the possibility of rush hour traffic. Jenkins contends that, but for trial counsel's error in summation, the jury would not have returned a guilty verdict on the first-degree robbery charges.

### 1.  Standard for Ineffective Assistance of Trial Counsel Claims

To prevail on an ineffective assistance of counsel claim, a petitioner must "(1) demonstrate that his counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms;' and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." United States v. Cohen, 427 F.3d 164, 167 (2d Cir. 2005) (quoting Strickland v. Washington, 466 U.S. 668, 688, 693 (1984)). The petitioner bears the burden of demonstrating that his defense counsel's performance was so inadequate as to violate his right to assistance of counsel under the Sixth Amendment to the United States Constitution. See Strickland, 466 U.S. at 696.

Under the first "deficiency" prong, the Court "must indulge a strong presumption that the counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. In evaluating counsel's effectiveness, the Court must keep in mind that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (quoting Rompilla v. Beard, 545 U.S. 374, 389 (2005)). Thus, the record must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009) (quoting Strickland, 466 U.S. at 687). Under Strickland's second "prejudice" prong, a petitioner "must establish that he suffered prejudice—in

this context, meaning that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Fulton v. Graham, 802 F.3d 257, 265 (2d Cir. 2015) (quoting Strickland, 466 U.S. at 694). "The Supreme Court has made clear that a district court considering a habeas corpus petition alleging ineffective assistance of counsel need not reach the issue of whether counsel's performance was deficient if the petition can be resolved through an examination of 'the prejudice suffered by the defendant as a result of the alleged deficiencies.'" Vargas v. United States, 951 F. Supp. 2d 531, 552 (S.D.N.Y. 2013) (quoting Strickland, 446 U.S. at 697).

AEDPA requires federal courts engaging in habeas review to grant state courts substantial "deference and latitude" when considering ineffective assistance of counsel claims that state courts have already rejected on the merits. Harrington, 562 U.S. at 101; see also Waiters v. Lee, 857 F.3d 466, 477 (2d Cir. 2017) ("AEDPA by its terms requires substantial deference to the state court's decision in all cases governed, as here, by [28 U.S.C.] § 2254(d).").

## 2. Ineffective Assistance During Plea Bargaining

### i. Legal Standard

A defendant's Sixth Amendment right to counsel "extends to the plea-bargaining process." Lafler v. Cooper, 556 U.S. 156, 162 (2012). Thus, the Strickland ineffective assistance standard is applicable to the plea bargaining context. Again, the deficiency component of the Strickland test asks whether a "counsel's representation fell below an objective standard of reasonableness." Kovacs v. United States, 744 F.3d 44, 50 (2d Cir. 2014) (quoting Strickland, 466 U.S. at 688). "A defense counsel's performance is unreasonable when it is so deficient that it falls outside the 'wide range of professionally competent assistance.'" Id. (quoting Strickland, 466 U.S. at 690).

In the plea bargaining context, a petitioner can establish prejudice by showing that:

> [B]ut for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Lafler, 556 U.S. at 164; see also Missouri v. Frye, 566 U.S. 133 (2012).

The likelihood that a petitioner would have accepted a plea bargain if accurately informed of his sentencing exposure is a question of fact. See Cullen v. United States, 194 F.3d 401, 405 (2d Cir. 1999) ("Though the ultimate determination of prejudice under Strickland may be regarded as an issue of law, . . . the determination of the likelihood that [the petitioner] would have accepted the plea bargain if he had been fully informed of its terms and accurately advised of the likely sentencing ranges under the plea bargain and upon conviction after trial was, like all predictions of what might have been, a factual issue, albeit a hypothetical one.").

When a petitioner testifies at an evidentiary hearing that he would have accepted a plea offer absent his attorney's alleged errors, the question of prejudice will most likely be resolved by a fact-finder's determination of the petitioner's credibility. The determination of a petitioner's credibility should be based on all relevant circumstances. Cullen, 194 F.3d at 405. "In assessing [a petitioner's] credibility, the fact-finder would be entitled, but not required, to consider [the petitioner's] continued protestation of innocence as weighing against the credibility of his claim, and to regard the disparity between the guideline range he faced and the range as represented by defense counsel as another factor bearing upon his credibility." Id. at 407. Thus, a petitioner who insists on his innocence throughout his trial, sentencing, and appeals may undermine his claim of prejudice. Vargas, 951 F. Supp. 2d at 553 (citing Zandi v. United States, 460 F. App'x 51, 53 (2d Cir. 2012)).

*ii. Review of the State Court's Decision*

After hearing Jenkins's testimony at the § 440.10 hearing and conducting a review of the record, Judge Condon determined that Jenkins failed to demonstrate prejudice. Thus, the state court decided Jenkins's plea-based ineffective assistance claim on the merits. The only question before this Court is whether the state court's determination that Jenkins had failed to meet his burden on the prejudice prong of Strickland was an unreasonable one.[8] The Court concludes that it was not.

Judge Condon's determination that Jenkins would not have accepted any plea offer was supported by ample evidence in the record and adduced at the hearing. For example, it was reasonable to interpret Jenkins's March 21, 2005 claim regarding his "life" being "taken" as indicating that knowledge of his sentencing exposure would not have influenced his decision to accept a plea. In addition, Judge Condon was permitted to credit the consistent testimony of ADA Barry, ADA Wood, and Meenan regarding Jenkins's lack of interest in pleading guilty, while deciding not to credit Jenkins's testimony on this issue. Moreover, Judge Condon found that Jenkins had "consistently, vigorously, and adamantly maintained his innocence and was 'absolutely' confident that he would not be guilty at trial," and noted that Jenkins had "professed his innocence" as recently as June 6, 2014 at the § 440.10 hearing. (§ 440.10 Decision.) Judge Condon was entitled to consider Jenkins's continued protestations of innocence as weighing against his credibility. See Cullen, 194 F.3d at 405.

---

[8] Respondent also argues that the state court's determination that Meenan's representation was not deficient under the first prong of Strickland was not unreasonable. However, because the prejudice inquiry clearly disposes of Jenkins's claim, the Court does not address this alternative ground. See Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."); see also Waiters, 857 F.3d 479 (quoting Strickland for the proposition that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").

While the bulk of petitioner's briefing discusses the deficiency prong of <u>Strickland</u>, which the Court does not reach, petitioner also asserts that Judge Condon's determination regarding prejudice was unreasonable in light of the evidence presented. Each of the arguments petitioner raises on this point are without merit.

First, Jenkins argues that Judge Condon improperly focused on whether Jenkins was adequately informed of his criminal history. Jenkins writes, "The Court added '[he] is not persuaded that [Petitioner] would have accepted a plea bargain had he been reminded of his violent criminal history by the People.'" (Reply ¶¶ 49–50 (citing § 440.10 Decision), ECF No. 16.) The focus, Jenkins argues, should have been on whether Jenkins was adequately informed of his sentencing exposure, not his criminal history. Contrary to petitioner's representations, Judge Condon's decision actually reads, "The Court is <u>not</u> persuaded that the defendant would have accepted a plea bargain had he been reminded of his violent felony criminal history during plea negotiations and the potential for a life sentence, as he was reminded at his arraignment by the People." (§ 440.10 Decision (emphasis in original).) This more complete excerpt reveals that the court properly relied on whether petitioner was informed of his sentencing exposure in rendering its decision.

Second, Jenkins argues that Judge Condon's statement during the § 440.10 hearing, in which he told petitioner "we don't allow not guilty people to plea in this courtroom, Mr. Jenkins," undermines the reasonableness of the court's prejudice finding. (Reply ¶ 51.) At the outset, the Court notes that this is an off-hand statement made by the court during the hearing—this statement is not included in Judge Condon's written decision. Nothing suggests that Judge Condon relied on this statement in deciding the § 440.10 motion. Additionally, nothing about this statement, in context, undermines Judge Condon's prejudice finding. Judge Condon made this statement in

response to certain ambiguous testimony from Jenkins, in which Jenkins appears to maintain his innocence while expressing his interest in pleading guilty. (6/6/14 H. 100–02.) Judge Condon's statement may be reasonably interpreted as a clarification, intended to inform petitioner that a person who pleads guilty cannot simultaneously maintain his innocence.

Third, and finally, petitioner points to evidence in the record that he contends undermines the state court's prejudice finding. (Pet'r's Mem. at 12, ECF No. 16-1.) For instance, Jenkins argues that his March 21, 2005 statement in which he describes his intention to discuss the four-year plea offer with his family reveals his interest in pleading. (Id.) Additionally, petitioner points to Meenan's § 440.10 testimony in which Meenan speculates that plea discussions with his client "would have been different" had Jenkins been accurately informed of his sentencing exposure. (Id.) These two pieces of evidence—one of which is speculative and the other of which is circumstantial—do not show that Judge Condon's factual determination was unreasonable. The mere existence of some evidence favorable to the petitioner is not sufficient, in the context of this case, to render Judge Condon's prejudice finding unreasonable.

This Court will not disturb the credibility determinations of a state fact-finder who presided over an evidentiary hearing when his determinations are sufficiently supported by the record. Given the substantial deference state courts are afforded under AEDPA, the Court cannot say that the state court's determination that Jenkins failed to demonstrate prejudice was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

### 3. Ineffective Assistance During Summation

#### i. Legal Standard

Although a single error during summation may be egregious enough to warrant reversal of a conviction, a habeas court "is required to consider alleged errors by counsel 'in the aggregate.'"

Hill v. Bradt, No. 13-CV-267, 2015 WL 5692818, at *3 (W.D.N.Y. Sept. 28, 2015) (quoting

Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001)), appeal dismissed, No. 15-3194 (2d Cir.

Dec. 4, 2015).  Where counsel's summation "does not fall outside the 'wide range of reasonable

professional assistance' and petitioner has made no showing of prejudice or that the result at trial

would have been different," a claim for ineffective assistance of trial counsel should be dismissed.

Melita v. United States, No. 99-CV-9044, 2001 WL 829867, at *12 (S.D.N.Y. July 20, 2001)

(quoting Strickland, 466 U.S. at 686).  In other words, a petition should be denied where "trial

counsel's summation did not 'so undermine[] the proper functioning of the adversarial process

[such] that the trial cannot be relied on as having produced a just result.'"  Carty v. Artuz, No. 97-

CV-4969, 2003 WL 22964577, at *6 (E.D.N.Y. Nov. 11, 2003) (citing Strickland, 466 U.S. at

686).

       *ii. Analysis*

After reviewing the trial record, the Second Department determined that Jenkins's claim

of ineffective assistance of counsel during summation lacked merit.  Thus, the question before this

Court is whether that determination was an unreasonable application of clearly established federal

law.  Sellan v. Kuhlman, 261 F.3d 303, 311–12 (2d Cir. 2011) ("[W]hen a state court fails to

articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is

on the merits, the federal court will focus its review on whether the state court's ultimate decision

was an 'unreasonable application' of clearly established Supreme Court precedent.").

Before turning to the specific argument raised by petitioner, it is important to stress that

trial counsel presented a coherent defense of Jenkins throughout the proceedings.  The record

shows that Meenan engaged in pretrial motion practice, conducted pretrial hearings, successfully

suppressed all but one of Jenkins's custodial statements (which was ultimately admitted on

24

pedigree grounds), and mounted a defense at trial. During summation, Meenan competently argued misidentification, emphasizing that all three witnesses had failed to identify many of Jenkins's unique physical characteristics in their initial descriptions to the police.

Jenkins argues that Meenan's accidental reference to "rush hour traffic" on a Sunday during his summation led the jury to discredit the defense and the defense's entire theory of the case. Jenkins contends that there is nothing worse than a botched alibi and, but for Meenan's erroneous reference to rush hour traffic, the jury would not have convicted him.

The Second Circuit has recognized that

[T]here is nothing as dangerous as a poorly investigated alibi. An attorney who is not thoroughly prepared does a disservice to his client and runs the risk of having his client convicted even where the prosecution's case is weak. A poorly prepared alibi is worse than no alibi at all.

Henry v. Poole, 409 F.3d 48, 65 (2d Cir. 2005) (citation omitted); id. ("[M]aintaining false alibis to meet a false charge is the way many defendants end up in prison. If the prosecution can establish the falsity of an alibi . . . , your case is as good as lost. Many jurors regard a false alibi as an admission of guilt." (citation omitted)).

Jenkins primarily relies on Henry v. Poole, a case which is distinguishable from the case at bar. In Henry, the defense's entire case consisted of eliciting an alibi, which turned out to be for the wrong date. This egregious error, which "went to the heart of the alibi" and "undermined the defense," was seized upon by the prosecution during summations. Id. at 64 (quoting People v. Long, 81 A.D.2d 521, 521–22 (N.Y. App. Div. 1st Dep't 1981)). Here, unlike in Henry, Meenan principally raised a misidentification defense. The particular day of the week and existence or nonexistence of rush hour traffic had no bearing on that defense. Even Meenan's tangential claim during summation, that Jenkins could not possibly have committed the robberies in Amityville, New York because he was in New Jersey three hours earlier, was not wholly undermined by his

slip of the tongue.  As respondent points out, there is always traffic between New Jersey and New York, especially during the holidays, and so Meenan's point may still have resonated with the jury. The Court agrees with respondent that the "minor faux pas of equating Christmas shoppers rushing home on a Sunday evening with regular commuters on workdays was hardly a major blow to the defense."  (Resp't. Mem. at 25, ECF No. 8-1.)

Moreover, the evidence against Jenkins at trial—which consisted of three separate eye witness identifications, cell phone records, and his relationship with his girlfriend (and co-defendant)—was strong, rendering it difficult for him to show prejudice.  See Vanterpool v. Kirk, No. 90-CV-813, 1990 WL 127644, at *2 (E.D.N.Y. Aug. 22, 1990) ("[A] blunder in the summation alone is insufficient to reverse a conviction on the grounds of ineffective assistance of counsel when overwhelming evidence supports defendant's conviction.").

The state court's decision, which summarily rejected Jenkins's ineffective assistance of counsel argument regarding summation, was not an unreasonable application of clearly established federal law.

### III.  CONCLUSION

For the foregoing reasons, the Petition is denied.  As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue.  28 U.S.C. § 2253(c)(2).  The Clerk of the Court shall enter judgment in favor of respondent and close this case.

**SO ORDERED.**

Dated:  June 30, 2017
Central Islip, New York

                              /s/ JMA
                              JOAN M. AZRACK
                              UNITED STATES DISTRICT JUDGE